FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 20, 2017

SEAN F. McAVOY, CLERK

KATHLEEN H. PAUKERT, WSBA No. 20247
PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Ste. 560
Spokane, Washington 99201
Telephone: (509) 232-7760
Email: kpaukert@pt-law.com
*Counsel for Relators Larry Jackson and Jeff Wilkerson*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA; <br> the States of ARKANSAS, CALIFORNIA, <br> COLORADO, CONNECTICUT, <br> DELAWARE, FLORIDA, GEORGIA, <br> HAWAII, ILLINOIS, INDIANA, IOWA <br> LOUISIANA, MARYLAND, <br> MASSACHUSETTS, MICHIGAN, <br> MINNESOTA, MISSOURI, MONTANA, <br> NEVADA, NEW HAMPSHIRE, NEW <br> JERSEY, NEW MEXICO, NEW YORK, <br> NORTH CAROLINA, OKLAHOMA, <br> RHODE ISLAND, TENNESSEE, TEXAS, <br> VERMONT, VIRGINIA, WASHINGTON, <br> WISCONSIN, THE DISTRICT OF <br> COLUMBIA, ex rel. JEFFREY <br> WILKERSON and LARRY JACKSON, <br><br> Plaintiffs-Relators, <br><br>     v. <br><br> ALLERGAN PLC, FOREST <br> LABORATORIES, LLC, <br> IRONWOOD <br> PHARMACEUTICALS INC., and <br> PARX SOLUTIONS, INC., <br><br> Defendants. | Civil Action No. 2:17-CV-427-SAB <br><br> **FILED UNDER SEAL** <br><br> *QUI TAM* **COMPLAINT** |

# TABLE OF CONTENTS

I.    STATEMENT OF THE CASE ................................................................. 1

II.   LEGAL FRAMEWORK ....................................................................... 6

  A.  Parties ......................................................................................... 6

  B.  Jurisdiction and Venue ............................................................... 8

  C.  The Applicable Laws, Which Have Been Violated ................................. 9

    1.   The Federal False Claims Act .............................................. 9

    2.   The Anti-Kickback Statute ................................................. 10

    3.   The State False Claims Acts ............................................... 11

    4.   The California and Illinois Insurance Fraud Prevention Acts ............. 12

    5.   The Securities Exchange Act of 1934 and Its Implementing
    Regulations ........................................................................... 15

III.  THE REGULATORY FRAMEWORK ........................................................ 16

    A.   The Federal-State Health Care Programs ........................................ 16

      1.   Medicaid Federal-State Health Care Program ............................. 16

      2.   The TRICARE Program ..................................................... 18

      3.   The Federal Employee Health Benefits Program ........................ 19

      4.   The U.S. Department of Veterans Affairs ................................. 19

    B.   FDA Prohibitions Against Off-Label and Misleading Marketing .... 19

IV.   THE OPIOID-BASED VIBERZI ............................................................. 21

    A.  Viberzi Has Dangerous Side Effects and Contraindications ...... 21

    B.  Taking Viberzi Has the Potential for Abuse and Addiction ....... 23

V.    HOW DEFENDANTS' FRAUDULENT SCHEME WORKED .............. 25

    A.  To Expand a Limited Market, Defendants Made False
    Representations to the Investing Public and Deceptively and
    Harmfully Promoted Viberzi ......................................................... 25

    B.  Defendants Deceptively and Harmfully Marketed Viberzi as a
    "Cure All" Drug for Any Gastrointestinal Problems ..................... 28

    C.  Allergan Paid Kickbacks to PARx to Further its Fraudulent
    Scheme ...................................................................................... 36

    D.  Allergan Paid Physicians Unlawful Kickbacks to Induce Them
    to Prescribe Viberzi and Linzess ................................................. 38

E.  Defendants Inserted Themselves into the Insurer's Payment Process to Make Sure the Patients Got the Drugs Allergan and Ironwood Were Promoting.. .........................................................43

F.  Defendants Knew that Compliance with the Relevant Laws Was Material to the Government's Decision to Pay Because They Went to the Essence of the Government's Bargain for Which it was Paying for Drugs.........................................................47

G.  Defendants' Alleged Scheme Would Violate a Corporate Integrity Agreement with HHS-IG .................................49

H.  Defendants Unlawfully Retaliated Against Relator Jackson ..51

COUNT I ...............................................................................55

COUNT II ..............................................................................56

COUNT III .............................................................................57

COUNT IV .............................................................................58

COUNT V ...............................................................................60

COUNT VI ..............................................................................61

COUNT VII .............................................................................62

COUNT VIII ............................................................................64

COUNT IX ..............................................................................65

COUNT X ...............................................................................67

COUNT XI ..............................................................................68

COUNT XII .............................................................................70

COUNT XIII ............................................................................71

COUNT XIV ............................................................................73

COUNT XV .............................................................................74

COUNT XVI ............................................................................76

COUNT XVII ...........................................................................78

COUNT XVIII ..........................................................................79

COUNT XIX ............................................................................81

COUNT XX .............................................................................82

COUNT XXI ............................................................................84

COUNT XXII ...........................................................................85

COUNT XXIII ..........................................................................86

COUNT XXIV ........................................................................ 88

COUNT XXV ......................................................................... 89

COUNT XXVI ....................................................................... 90

COUNT XXVII ...................................................................... 91

COUNT XXVIII..................................................................... 92

COUNT XXIX ....................................................................... 94

COUNT XXX......................................................................... 95

COUNT XXXI ....................................................................... 96

COUNT XXXII ..................................................................... 97

COUNT XXXIII.................................................................... 101

## *QUI TAM* COMPLAINT

This is a *qui tam* action by Plaintiffs-Relators Jeffrey Wilkerson and Larry Jackson to recover treble damages and civil penalties arising from the actions of Defendants Allergan PLC, Forest Laboratories, Ironwood Pharmaceuticals Inc., and PARx Solutions, Inc.  The laws that were violated include the Federal False Claims Act, certain state False Claims Acts, the Federal Anti-Kickback Statute, the California and Illinois Insurance Fraud Prevention Acts, and the Securities and Exchange Act.

## I.    STATEMENT OF THE CASE

1.    This case is about Defendant drug manufacturers (Allergan and Forest), and their partners (Ironwood and PARx) knowingly promoting drugs, including the opioid drug Viberzi and Linzess, for uses that were not approved as safe and effective by the Food and Drug Administration (FDA) ("off-label uses") and paying unlawful kickbacks to doctors to prescribe these addictive and potentially dangerous opioids for patients.

2.    This case falls squarely within Attorney General Sessions enforcement initiative "to help combat the devastating opioid crisis that is ravaging families and communities across America," announced on August 2, 2017.

3.    The case is also the precise kind of health care fraud the states of California and Illinois sought to address when they enacted laws to protect private health insurance policyholders.  As stated by the California legislature: "Health

insurance fraud is a particular problem for health insurance policyholders. Although there are no precise figures, it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally. Health care fraud causes losses in premium dollars and increases health care costs unnecessarily."

4.     In July 2014, Allergan acquired Forest and the gastrointestinal drugs Viberzi and Linzess, among others, which are included in this Complaint.

5.     On December 14, 2015, Allergan announced its launch of Viberzi: "We are excited about the launch of VIBERZI, which addresses an unmet need among IBS-D patients seeking a treatment to manage their symptoms proactively," said William Meury, President and Executive Vice President, Branded Pharma at Allergan. "This introduction reaffirms Allergan's commitment to providing a new treatment option that serves to help gastroenterologists reach better outcomes for their patients." https://www.prnewswire.com/news-releases/allergan-announces-us-availability-of-viberzi-eluxadoline-for-treatment-of-irritable-bowel-syndrome-with-diarrhea-ibs-d-in-adults-300192172.html ("Allergan Announces U.S. Availability of VIBERZI™ (eluxadoline) for Treatment of Irritable Bowel Syndrome with Diarrhea (IBS-D) in Adults")

Prior to Allergan's acquisitions, on May 27, 2015, Viberzi was approved by the FDA for use by adults diagnosed with Irritable Bowel Syndrome with Diarrhea (IBS-D).     Viberzi is the trade name for the drug eluxadoline.

https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm448328.htm.

7.     Because of its potential for abuse and dependence as an opioid-based prescription drug, the DEA has categorized Viberzi as a Schedule IV drug, pursuant to the Controlled Substances Act, because Viberzi may lead to limited physical or psychological dependence.

8.     On August 30, 2012, Ironwood and Forest announced the FDA approval of Linzess.   http://investor.ironwoodpharma.com/releasedetail.cfm?ReleaseID=703917   ("Ironwood and Forest Announce FDA Approval of LINZESS™ (Linaclotide) for the Treatment of Irritable Bowel Syndrome with Constipation and Chronic Idiopathic Constipation")

9.     Linzess is approved by the FDA for use by adults diagnosed with Irritable Bowel Syndrome with Constipation (IBS-C).  Linzess is the trade name for the drug linaclotide.

10.   On December 17, 2012, Ironwood and Forest made Linzess available in the United States. http://investor.ironwoodpharma.com/releasedetail.cfm?ReleaseID=727162 (Ironwood and Forest Announce U.S. Availability of LINZESS)

11.   Prescriptions for Viberzi and Linzess, among other drugs distributed by Defendants, for federal and state beneficiaries, were paid for by all the federal and state health care programs, including Medicare and Medicaid, among others.

Prescriptions were also paid for by private insurers in the states of California and Illinois.

12.   Defendants aggressively co-promoted Viberzi and Linzess, among other drugs, demanding that their sales forces do "whatever is necessary to move the drug," including paying unlawful kickbacks to doctors to prescribe the drugs and otherwise pushing the drugs on patients who did not have IBS-D or IBS-C, knowing full well the serious FDA warnings that improper use could lead to addiction, hospitalization, and even death.

13.   Defendants unlawfully paid doctors thousands of dollars for so-called speaking engagements and lavished them with catered events with the expectation that the doctors would write more prescriptions than they otherwise would for Viberzi and Linzess, among other Allergan drugs.  These payments were illegal inducements hardly veiled to appear like legitimate reasons to pay doctors.

14.   Defendants' marketing and sales campaign pushed Viberzi and Linzess, among other drugs, without regard to a patient's diagnosis, by:

- promoting Viberzi to anyone with slight abdominal discomfort ("bellyache") who wants to be able to "eat anything he or she wants"
- instructing medical professionals to disregard the dangerous side effects of Viberzi when taken with alcohol
- minimizing the addictive properties and contraindications of Viberzi
- co-promoting Viberzi with Linzess despite each drug's on-label indication for different diagnoses
- facilitating financial assistance for government beneficiaries to push Viberzi
- illegally paying doctors to prescribe Viberzi and Linzess

- controlling and manipulating the prior authorizations normally required before use of these highly addictive drugs, through Defendant PARx Solutions' services
- using their own salespeople to promote the company (PARx) to patients in exchange for PARx' speedy processing of prior authorizations (normally required before prescribing addictive drugs) for prescriptions of Viberzi

15.    It appears that Defendants Allergan and Ironwood used and conspired with a private consulting company, PARx Solutions, to further their fraudulent scheme.

16.    Defendants appear to have had an improper kickback arrangement whereby PARx pushed through as many "prior authorizations" as possible so that there would be no impediment or delay to patients getting prescriptions for Viberzi filled.  In exchange, Allergan strategically promoted PARx services to at least federal and state health care beneficiaries.   For the conspirators—Defendant manufacturers and PARx—the arrangement was financially beneficial for them, but was at the expense of patient health, taxpayer money, and private insurers in California and Illinois.

17.    Through this fraudulent scheme, which included paying kickbacks to induce drug prescriptions and payments, Defendants knowingly caused false claims for federal and state drug reimbursement to the government.  Defendants also knowingly caused the submission of false claims to private insurers in the states of California and Illinois.

18.     Defendants' fraudulent conduct alleged in this Complaint may also be in violation of the Securities and Exchange Act, and of an extended corporate integrity agreement (CIA) between the Office of Inspector General of the United States Department of Health and Human Services and Allergan's predecessor, Forest.

## II.     LEGAL FRAMEWORK

### A.     Parties

19.     Relators allege, based upon their personal knowledge and relevant documents and information, the facts set forth in this Complaint.  Relators have standing to bring this action pursuant to 31 U.S.C. §3730(b)(l).  Prior to becoming aware of any known public disclosure under subsection (e)(4)(a) of 31 U.S.C. § 3730, Relators voluntarily disclosed to the Government the information on which the allegations or transactions in this claim are based; and Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions that may exist, and have voluntarily provided the information to the Government before filing an action.  Relators are either entitled to between 15-25 percent of the proceeds that result from this action or any settlement of the claims raised or identified herein, under 31 U.S.C. § 3730(d)(1); or between 25 – 35 percent of the proceeds pursuant to 31 U.S.C. §3730(d)(2).

20.     Relator Larry Jackson has over 20 years of experience as a pharmaceutical sales representative.  He is a former Allergan Senior Specialty

Sales Representative who worked for Allergan from 2013 to 2017. Relator Jackson was responsible for Allergan's Tulsa, Oklahoma, Northwest Arkansas, and Southwest Missouri territories. Relator Jackson, like Relator Wilkerson, worked in Allergan's Gastroenterology Group and promoted drugs, including Viberzi and Linzess. Relator Jackson also has considerable experience in Medicare managed care as he assisted in the launch and promotion of Medicare Part D products throughout Northwest Arkansas and Eastern Oklahoma as a field sales product manager with Arcadian Health Plans. Relator Jackson left Allergan because he was retaliated against for, raising, objecting to, and resisting fraudulent conduct alleged in this Complaint.

21. Relator Jeffrey Wilkerson has over 8 years of experience in the medical and pharmaceutical sales industry. He is a former Allergan sales representative who worked for Allergan from 2013 to 2016. Relator Wilkerson was responsible for Allergan's Memphis, Tennessee metro area territory. He worked in Allergan's Gastroenterology Group. In his capacity as a Senior Specialty Sales Representative with Allergan, Relator Wilkerson was responsible for marketing and sales of numerous drugs, including Viberzi and Linzess.

22. Defendant Allergan PLC (Allergan) is a multinational pharmaceutical company headquartered in Dublin, Ireland. Allergan's United States operations are headquartered in Parsippany, New Jersey.

23. Allergan has a large marketing and sales presence in Spokane,

Washington, which includes the drugs alleged in this Complaint. Further, both Relators had contact, or communicated, with other sales representatives or managers in the region covering Spokane who marketed the same universe of drugs. For example, in 2013, the district manager who interviewed Relator Jackson was from Spokane. As another example, one of the managers who was responsible for Relator Jackson's performance award in 2016, oversaw the western sales division, which included Spokane, Washington.

24.   Defendant Forest Laboratories LLC is a subsidiary of Allergan PLC and is headquartered in New York, New York.

25.   Defendant Ironwood Pharmaceuticals, Inc. is biotechnology company that has a co-promotion agreement with Allergan PLC to co-promote Viberzi. Ironwood is headquartered in Cambridge, Massachusetts.

26.   Defendant PARx Solutions, Inc. is a web-based health care company that provides prior authorization support system solutions and is headquartered in Burlington, Massachusetts.

**B.   Jurisdiction and Venue**

27.   This Court has subject matter jurisdiction over the claims asserted herein pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and 28 U.S.C. § 1331.

28.   Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because one or more defendants may be found, resides, and/or transacts business

in this District, or because an act, proscribed by 31 U.S.C. § 3729, occurred in this District.

**C.    The Applicable Laws, Which Have Been Violated**

      **1.    The Federal False Claims Act**

29.    The False Claims Act provides, in part: Liability for Certain Acts. — (1) In general.—[  ] any person who— (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [ ] (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, [  ] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(A), (B), (G).

30.    Under the False Claims Act, scienter must be demonstrated: **Definitions**—For purposes of this section— (1) **the terms "knowing" and "knowingly"**— (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth

or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) **the term "claim***" —* (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; [] . 31 U.S.C. § 3729(b)(1)-(2).

### 2.     The Anti-Kickback Statute

31.    The Anti-Kickback Statute gives rise to additional causes of action under the False Claims Act: (b) **Illegal remunerations**—(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind— (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any

good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.  (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

32.    (h) **Actual knowledge or specific intent not required**—With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.  42 U.S.C. §1320a-7b(h).

### 3.    The State False Claims Acts

33.    The False Claims Act of numerous states are alleged in this Complaint, including the states of Arkansas, California, Colorado, Connecticut, Delaware,

Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Wisconsin, Washington, and the District of Columbia.

### 4. The California and Illinois Insurance Fraud Prevention Acts

34. The states of California and Illinois have enacted Insurance Fraud Prevention Acts that permit Relators to bring a *qui tam* action to recover for fraudulent claims submitted to private insurance companies in those states, as alleged in the Counts below.

35. Although this Complaint has focused on the impact of Defendants' practices on the federal and state governments, these same practices also defraud private insurance companies in the same manner that the practices defraud the federal and state governments.

36. The practices alleged in this Complaint are systematic, nationwide practices that defraud private insurance companies that reimburse prescription drugs in every state where Defendants conduct business, including California and Illinois.

37. The kickback scheme that Defendants pursued added substantial costs to health care in the states named in this Complaint, including California and

Illinois.

38.    California state law prohibits Defendants from providing kickbacks to physicians and medical care providers.  Specifically, **California Business & Professional Code § 650(a)** provides: "[T]he offer, delivery, receipt, or acceptance by any person licensed under this division or the Chiropractic Initiative Act of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any membership, proprietary interest or co-ownership in or with any person to whom these patients, clients, or customers are referred is unlawful."

39.    **California Penal Code § 549** makes it illegal for any firm or corporation to "solicit[], accept[],or refer[] any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether" that individual or entity will present or cause to be presented any false or fraudulent claim for payment of a health care benefit.

40.    **California Insurance Code § 1871.7(a)** prohibits the knowing employment of "runners, cappers, steerers or other persons to procure clients or patients ... to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer."

41.   **California Insurance Code § 1871.7 (b)** provides for civil recoveries against person who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits the following activities, among others: "(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

**********

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim; (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

************

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following: (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact; (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of our opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact; (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

42.   **Illinois Insurance Claims Fraud Prevention Act, §5(b)** provides:  A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an

assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

43.    **Illinois Criminal Code, Article 46** provides criminal penalties for any person who commits the offense of insurance fraud.  720 Ill. Comp. Stat. §5/46-1(a).

44.    **Illinois Insurance Claims Fraud Prevention Act §15(a)** provides for a *qui tam* civil action to create incentives for private individuals to prosecute violations of the statute.  740 Ill. Comp. Stat. §92/15(a).

45.    The Illinois Insurance Claims Fraud Prevention Act makes it unlawful for any person to knowingly obtain, attempt to obtain, or cause to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company.  740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat §5/46-1(a).

### 5.    The Securities Exchange Act of 1934 and Its Implementing Regulations

46.    The Securities and Exchange Act of 1934 prohibits publicly traded companies and their representatives from making false or misleading statements to the investing public.

47.    In particular, the Securities and Exchange Act finds persons (defined to include corporations and associations existing under or authorized by the laws

of the United States, 15 U.S.C. § 7) liable for making or causing to be made any false or misleading statement with respect to any material fact that causes others, in reliance upon such statement, to have purchased or sold a security at a price which was affected by such statement for damages caused by such reliance.  *See* 15 U.S.C. § 78r, *et al.*

48.   Further, further requirements make it unlawful "(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240 (10b-5).

49.   The Securities and Exchange Commission enforces other statutory and regulatory requirements to prosecute false and misleading statements made to the investment community, *see e.g.*, Investment Advisors Act of 1940 § 207.

## III.   THE REGULATORY FRAMEWORK

### A.   The Federal-State Health Care Programs

#### 1.   Medicaid Federal-State Health Care Program

50.   Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal portion of each state's Medicaid payments varies by state and is generally between 50 and 83 percent, depending on the state's per capita income.  42 U.S.C. § 1396d(b).

51.    The Medicaid Drug Rebate Program ("Rebate Program") is a partnership between CMS, State Medicaid Agencies, and participating drug manufacturers that helps to offset the Federal and State costs of most outpatient prescription drugs dispensed to Medicaid patients.  The Rebate Program requires, among other things, that a drug manufacturer enter into, and have in effect, a national rebate agreement ("Rebate Agreement") with the Secretary of HHS in exchange for State Medicaid coverage of most of the manufacturer's outpatient prescription drugs.  Manufacturers are then responsible for paying rebates to states for those drugs based in part on the utilization by Medicaid patients.  These rebates are paid by drug manufacturers on a quarterly basis and are generally shared between the States and the Federal government to offset the overall cost of the prescription drugs under the Medicaid program.

52.    Under the Rebate Program, all states are generally required to provide coverage for drugs that meet the definition of a covered outpatient drug, as defined in the federal Medicaid Drug Rebate Statute, 42 U.S.C. § 1396r-8(k)(2).  Once the manufacturer enters into a Rebate Agreement, a state is generally required to cover that manufacturer's covered outpatient drugs under the state plan (with certain limited exceptions) unless "the prescribed use is not for a medically accepted indication."  42 U.S.C. § 1396r-8(d)(1)(B)(I).

53.    The Medicaid Rebate Statute defines "medically accepted indication" as any FDA approved use or a use that is "supported by one or more citations

included or approved for inclusion in any of the compendia" set forth in the statute. 42 U.S.C. § 1396r-8(k)(6).

54. A drug does not generally meet the definition of a "covered outpatient drug" if it is prescribed for a use that is neither FDA-approved nor supported by a citation included or approved for inclusion in the compendia. 42 U.S.C. § 1396r-8(k)(3). CMS has stated that the statutory definition of medically accepted indication "requires coverage of off-label uses of FDA-approved drugs for indications that are supported (as opposed to listed) in the compendia." Medicaid State Rebate Release No. 141 (May 4, 2006) (emphasis added). Thus, even if a drug is FDA-approved for one indication, Medicaid ordinarily does not cover other uses that do not qualify as medically accepted indications.

## 2.    The TRICARE Program

55. TRICARE is a managed health care program established by the Department of Defense. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

56. The regulatory authority establishing the TRICARE program does not cover drugs not approved by the FDA. *See* 32 C.F.R. § 199.4(g)(15)(i)(A).

57. TRICARE does not cover drugs used for off-label indications unless such off-label use is proven medically necessary and safe and effective by medical literature, national organizations, or technology assessment bodies. *See* 32 C.F.R.

§ 199.4(g)(15)(i)(A)(Note).

### 3.    The Federal Employee Health Benefits Program

58.    The Federal Employee Health Benefits Program ("FEHBP") is a federally-funded health care program established by Congress in 1959, pursuant to the Federal Employees Health Benefits Act.  5 U.S.C. §§ 8901, *et seq*.

59.    OPM administers this program and contracts with various health insurance carriers to provide services to FEHBP members.  *Id*. at §§ 8902, 8909(a).

60.    Monies for the FEHBP are maintained in the Employees Benefits Fund ("Treasury Fund"), which OPM administers.  *Id*. at § 8909(a).  The Treasury Fund – which the United States Treasury holds and invests – is the source of all relevant payments to the insurance carriers for services rendered to members.  *Id*. at § 8909.

### 4.    The U.S. Department of Veterans Affairs

61.    The U.S. Department of Veterans Affairs (VA) maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are purchased directly or indirectly by the VA and dispensed to beneficiaries.  It also supports a mail service prescription program as part of the outpatient drug benefit.  The system serves millions of veterans.

### B. FDA Prohibitions Against Off-Label and Misleading Marketing

62.    The FDA regulates drugs based on the "intended use" or "indication" for which the drug has been approved by the FDA.  To market and sell a

prescription drug, the manufacturer must demonstrate to the FDA – through the established processes – that the drug is safe and effective for each intended use. 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a)(b)(d); 21 CFR 201.128. Marketing a drug for uses other than those "intended uses" for which the drug has been approved causes the drug to be misbranded and is prohibited. 21 U.S.C. § 331 (a)(d); 21 U.S.C. 352. Such conduct implicates civil and criminal penalties. 21 U.S.C. § 331; 21 U.S.C. § 333.

63.  Marketing drugs for purposes other than that which they are approved is commonly referred to as "off-label marketing." Off-label marketing can occur when a pharmaceutical company promotes its drugs for an indication (e.g., a disease or a symptom) that has never received FDA approval as well as when a pharmaceutical company promotes drugs for a patient population, dosage or dosage form that does not have FDA approval.

64.  The FDA prohibits any "advertising" that recommends or suggests off-label uses for an approved drug.  21 U.S.C. § 331(d); 21 C.F.R. 202.1(e)(4)(i)(a).

65.  The FDA definition of "advertisement" includes the verbal representations made by pharmaceutical sales representatives. *See* Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed Reg. 64,074. This definition includes "information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the

product." *Id.*

66.   While truthful, balanced, and complete off-label promotion of a drug may be legal, *U.S. v. Caronia*, 703 F.3d 149 (2d Cir. 2012), promotion of a prescription drug product with false, misleading, or selective statements can constitute a false claim.  *See Hawkins v. Medtronic, Inc.*, Case No 1:13-CV-00499, 2014 WL 346622, at *7 (E.D. Cal. Jan. 30, 2014) ("The Ninth Circuit has considered this issue and found that off-label promotion is unlawful," in a case involving medical devices, *Carson v. Depuy Spine, Inc*., 365 Fed. Appx. 812, 815 (9th Cir. 2010)); *Martin v. Medtronic, Inc.,* 32 F. Supp. 3d 1026, 1037-38 (D. Ariz. 2014) ("The FDCA does prohibit untruthful off-label promotion.").

67.   Without these prudent limitations on off-label marketing, pharmaceutical manufacturers would still be able to market approved drugs as "cure-all" medications for any ailment.  Indeed, that is exactly what Defendants intended for Viberzi when marketing it as a drug for all patients "who want to eat whatever they want without fear of diarrhea."  The same is true for Defendants' marketing of Linzess and other drugs.

## IV.   THE OPIOID-BASED VIBERZI

### A.   Viberzi Has Dangerous Side Effects and Contraindications

68.   Viberzi is classified by the Drug Enforcement Administration (DEA) as a Schedule IV controlled substance under the Controlled Substances Act.

69.   According to the DEA, Schedule IV drugs, substances, or chemicals

are defined as drugs with a low potential for abuse and low risk of dependence. Some examples of Schedule IV drugs are: Xanax, Soma, Darvon, Darvocet, Valium, Ativan, Talwin, Ambien, Tramadol. https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm392396.htm

70.   As a Schedule IV opioid that locally impacts the gastrointestinal system, there are numerous potential harmful side effects from taking Viberzi – particularly if the individual taking Viberzi does not exhibit the clinical disease state of IBS-D.

71.   Further, there are several serious and potentially deadly contraindications of Viberzi.

72.   For example, patients who don't have gallbladders can have an increased risk of serious pancreatitis that can lead to hospitalization or death. Also, for example, patients who drink more than three alcoholic beverages per day can be harmed by taking Viberzi. Harmful and potentially deadly effects are compounded when Viberzi is taken by patients who do not have IBS-D.

73.   On March 15, 2017, the U.S. Food and Drug Administration (FDA) issued a warning that Viberzi should not be prescribed to patients who do not have a gall bladder because these patients have an increased risk of developing pancreatitis.

74.   As of February 2017, the FDA received 120 reports from the FDA Adverse Event Reporting System of serious cases of pancreatitis or death

[SEALED] *QUI TAM* COMPLAINT - 22

stemming from patients taking Viberzi.   Seventy-six of these patients were hospitalized and two patients died.

75.   Gastroenterologists with the FDA advise that when a patient is confronted with IBS symptoms, "Drugs are a last option. Patients should try dietary modifications, relaxation techniques, and other lifestyle changes, such as exercise, before resorting to medication." https://forum.drugs-and-users.org/index.php?topic=2276.0

**B.   Taking Viberzi Has the Potential for Abuse and Addiction**

76.   Eluxadoline is the active drug in Viberzi.  It has central nervous system opioid properties like other Schedule IV opioids that have been found to be addictive.

77.   Other drugs with similar chemical properties to eluxadoline such as pentazocine, nicknamed the "poor man's heroin" because of the thousands of addicts who take the drug, are primary sources of drug abuse and addiction.

78.   In human abuse potential studies, eluxadoline produced a high rate of euphoria and exhibited similar "drug liking" responses to pentazocine. Essentially, this meant that half the subjects in this study reported a pleasurable feeling or getting "high" from taking eluxadoline.

79.   The path of addiction and death directly track prescription opioid development and prescribing levels.  From 2000 to 2015, more than half a million Americans died from drug overdoses, and, as of December 2016, opioid overdoses

were killing Americans at a rate of 91 deaths per day.

80.   The National Institute on Drug Abuse (NIDA), a component of the National Institutes of Health (NIH), has pointed to "[s]everal factors [that] are likely to have contributed to the severity of the current prescription drug abuse problem.  They include drastic increases in the number of prescriptions written and dispensed, greater social acceptability for using medications for different purposes, and aggressive marketing by pharmaceutical companies.  These factors together have helped create the broad 'environmental availability' of prescription medications in general and opioid analgesics in particular."

81.   Just two months after Viberzi's release in the United States, drug abusers began experimenting with its opioid effects.  On February 20, 2016, a post by screenname "twstedroads" on the website Dope Talk, an online forum focused on drug use explained the "rush" received when abusing Viberzi intravenously: "So I decided to be bold enough and break down a 100 mg Viberzi to prep for IV. I may have been one of the first people to experiment with this new opiate for IBS in this way.  I got way more than I expected. This particular molecule gives a very nice rush when IV'd."

82.   Answering questions from other Dope Talk users regarding how to best administer Viberzi intravenously, twstedroads instructs how he prepared the Viberzi pill for IV use and how "so pleasantly surprised of the opiate rush I got and the opiate warmth that stuck around."  Like the subjects in the human abuse

clinical trials of Viberzi – Twstedroads notes "I would always prefer say an oxycodone or heroin shot to this but it is still a great opiate…and without a doubt has significant value."

83.   This post on Dope Talk has been viewed 13,695 times as of December 19, 2017.

## V.   HOW DEFENDANTS' FRAUDULENT SCHEME WORKED

### A.   To Expand a Limited Market, Defendants Made False Representations to the Investing Public and Deceptively and Harmfully Promoted Viberzi

84.   Allergan acquired eluxadoline from another pharmaceutical developer and manufacturer, Furiex Pharmaceuticals, Inc. (Furiex), for over $1 billion dollars in July 2014.

85.   Immediately after the purchase, Allergan sold rights to Furiex's two other primary assets – two drugs known as Alogliptin (anti-diabetic treatment) and Priligy (pre-ejaculation treatment) – but retained eluxadoline.

86.   Allergan believed that it would recoup this investment by extending Allergan's current gastrointestinal (GI) business through the aggressive marketing and sale of eluxadoline as the brand name Viberzi.

87.   At the time of its acquisition, Allergan expected that eluxadoline would be a first-in-class drug for treating symptoms of diarrhea-predominant irritable bowel syndrome (IBS-D), publicizing to its investors and the public that IBS-D affects approximately 28 million patients in the United States and Europe.

88.    Similarly, Ironwood represented that 30 million Americans suffer from IBS-D (diarrhea) or IBS-C (constipation), when publicly identifying the population it planned to target with Allergan in the co-promotion of the drugs Viberzi and Linzess (on-label for IBS-C).

89.    Despite Defendants' optimistic public statements, the number of patients with an IBS-D diagnosis was nowhere near the tens of millions of sufferers that Defendants were publicizing to generate interest and investment. So, not surprisingly, when Viberzi was released on December 14, 2015, sales for the drug were far below Defendants' publicly-announced projections.

90.    Defendants strategically planned to expand this small market of patients with IBS-D before Viberzi's formal launch. Defendants knew all along that they had to find ways to widen the scope of the off-label market for Viberzi (and Linzess) since they knew that IBS-D market was small. Defendants were ready to promote and sell Viberzi—a Schedule IV opiate drug with similar addictive properties as drugs responsible for the opiate epidemic –by any means necessary to achieve sales growth, including to patients who did not have IBS-D.

91.    Allergan and Ironwood sales representatives, including managers, solicited patient lists from health care providers in their territories to identify the numbers of patients diagnosed with IBS-D, and more broadly patients who complained of having diarrhea.

92.    The solicitation of these patient lists necessarily included the receipt

of confidential patient information, possibly in violation of laws protecting patient confidentiality, such as the Health Insurance Portability and Accountability Act (HIPAA).

93.   As but one example, at the time of the launch of Viberzi, an Allergan GI Specialty Sales Representative for the Tupelo, Mississippi territory (B.K.), requested the patient list from the largest specialty provider for gastroenterology services (D.H.S.) in his territory.  Not surprisingly, there were only 18 patients with an IBS-D diagnosis, but 100s of patients with unspecified or other types of diarrhea ("off-label patient").

94.   Such off-label patient lists provided Defendants with a road map of people who served as their promotional and sales targets for the off-label market.

95.   Allergan strategically planned at the get-go to dramatically widen the coverable market for Viberzi to make good on the representations Defendants made to investors to garner support for the acquisition of Forest and these gastrointestinal drugs.

96.   As early as the time of launch in December 2015, Allergan was directing its sales force to expand the market for the drug beyond IBS-D sufferers by making false or fraudulent representations.  The salesforce was instructed to promote the drug to hide or downplay Viberzi's contraindications and addictive properties.

97.   And Defendants succeeded in their strategy through improper off-

label promotion and the payment of kickbacks to providers and its partner PARx. The sale of Viberzi multiplied by a hundred-fold in the first few months of the launch, totaling 64,000 prescriptions by the sixth month of the drug's launch.

**B.   Defendants Deceptively and Harmfully Marketed Viberzi as a "Cure All" Drug for Any Gastrointestinal Problems**

98.   With these off-label patient lists in hand, Allergan GI sales representatives, including managers, were directed to promote Viberzi off-label for all patients with any gastrointestinal issues such as occasional diarrhea or loose stools.

99.   Defendants' sales pitch was that Viberzi was a "cure all" drug—a wonder drug—that would allow patients to "eat whatever they wanted without fear of diarrhea."

100. Defendants further instructed sales staff to minimize Viberzi's contraindication that warned against taking the drug when consuming more than three alcoholic beverages per day.

101.   Defendants ensured that this sales pitch was heard across all practice specialties and all regions nationwide.   Although Relators covered different territories in Arkansas, Oklahoma, and Missouri, the instructions they received on how to speak about Viberzi was strikingly similar.

102. Defendants never instructed sales representatives to discuss or raise the fact that Viberzi is an opiate-based drug with addictive qualities.   That fact

was not to be talked about with providers.

103. Shortly after the launch of Viberzi, in December 2015-February 2016, G.F. coached Relators to (a) improperly promote Viberzi for patients who were not recommended to take Viberzi and, (b) disregard Viberzi's contraindications, addictive properties and side effects.  G.F. was one of Relators' supervisors and the regional manager for the Mid-South region, which includes Arkansas, North Mississippi, North Alabama, Western Tennessee, and Eastern Oklahoma.

104. G.F. would accompany Relators on field-rides.  A "field-ride" is typically considered a training session where a supervisor travels a territory with a sales representative to guide, instruct and evaluate the sales representative – through example —on how to promote drug(s) to heath care providers, as expected by Allergan.

105. During one field-ride, G.F. and Relator Jackson visited a liver care clinic.  When Relator discussed with a nurse practitioner (J.M.) that Viberzi was contraindicated for patients who drank three or more alcoholic beverages per day, the nurse noted that this contraindication would prohibit "half of her patients from taking Viberzi."  G.F. interjected: "don't worry about it, some people can hold their liquor better than others, I take Viberzi myself and I can go to the lake and throw down a 12 pack of beer and it has never affected me."

106. After this meeting, G.F. reprimanded Relator Jackson for discussing the contraindications with the nurse.  G.F. went even further and advised Jackson

that he would be filling out a coaching report about Jackson based on the field-ride, and that the report was going to "sting."

107. In February 2016, the same regional manager for the Mid-South region called a meeting with the Memphis area sales representatives to address the lack of Viberzi prescriptions being written in the Memphis area.

108. At the meeting, Allergan management acknowledged that Allegan's projected market for Viberzi prescriptions was not what it had publicly projected.

109. In fact, at the time of its public pronouncements, Allergan knew that the number of patients diagnosed with IBS-D (or IBS-C) was not in the millions, as it had publicly stated. These statements at the time made to investors were knowingly false, fraudulent or misleading, in violation of the Securities and Exchange Act.

110. Now that the acquisition had occurred, Allergan had to make good on its sales growth promises to investors. Disclosing to its salesforce that the numbers weren't what Allergan projected generated the effect Allergan wanted – panic among the sales force about meeting Viberzi prescription targets and goals.

111. Allergan management instructed its sales force, including the representative affiliates from Ironwood, to straightaway and aggressively promote Viberzi off-label to patients who had loose, runny or watery stools and belly pain, or who simply wanted to "eat whatever they wanted without fear of diarrhea."

112. At the February 2016 meeting, Regional Manager G.F. also instructed

the sales representatives to actively downplay and minimize Viberzi's warning to avoid taking the drug when consuming more than three alcoholic beverages per day—one of the drug's contraindications.   G.F. pointed out that this contraindication significantly limited the available patient population who should take or be prescribed Viberzi.

113. The same day of this meeting in early February 2016, G.F. accompanied Relator Wilkerson on a field-ride.

114. During this field-ride, G.F. and Relator Wilkerson targeted several providers, including internal medicine practitioners in Memphis, Tennessee, Dr. L.W. and Dr. T.D.

115. To the providers, G.F. described Viberzi as a prescription drug for patients with occasional loose stools and occasional belly pain, stating "if patients have one or two loose stools per month then they are a candidate for Viberzi."

116. G.F. promoted Viberzi as if it were intended as a gastrointestinal panacea for just about anything related to belly troubles.  He told health care providers that taking the drug would allow their patients to eat whatever they wanted to eat.  He made these representations despite medical literature and industry guidance that advocate a controlled and limited diet as the first line treatment for IBS-D, and its related symptoms.

117. G.F. represented to providers that "if patients are afraid to go eat Chinese food because they will have diarrhea then prescribe them Viberzi."

118. G.F. more generally also communicated to Drs. L.W. and T.D. that "if patients are afraid to eat anything they want because they will have diarrhea then they are a candidate for Viberzi."

119. During this same training session, G.F. minimized Viberzi's contraindication for patients who drink more than three alcoholic beverages per day.  Instead, G.F. told physicians that the only contraindication for the drug was for patients who abuse alcohol.  G.F. misrepresented to doctors that there were no specific number of alcoholic beverages that were contraindicated for taking the drug.

120. G.F. then reminded Relator Wilkerson about Allergan's marketing strategy for Viberzi: avoid discussing with medical staff the need for a formal IBS-D diagnosis, focus instead on prescribing the drug for the common symptoms of "loose, watery stools and belly aches," and never mention the contraindication about the danger of consuming "three or more alcoholic beverages per day" while taking Viberzi.  G.F. also told Relator Wilkerson to "educate" other sales representatives about this strategy.  It was also clear that the sales force was not to mention the fact that Viberzi was an opioid-based drug.

121. Allergan trained its sales force to avoid mentioning to physicians that Viberzi was a Schedule IV opioid-based drug and to encourage physicians to keep Viberzi "on the shelf" for patients who experienced general gastrointestinal problems.

122. Allergan sales representatives pushed primary care physicians to distribute free Viberzi samples to patients.  At the direction of Allergan, the sales force was not making full disclosures to the physicians that the "free samples" were drugs that had opioid-based addictive properties.

123. Allergan's off-label promotion strategy was consistent across all marketing territories.

124. In another instance in February 2016, an Allergan District Manager R.U. forwarded an email from G.F., and included his own message, about "challenging the normal" patient profile for IBS-D.  The communication was an email blast to sales representatives, stating "[w]e sometimes paint too severe of a picture of the patient.  The verbiage below [referring to G.F.'s email, which was included] will help us broaden the patient type to the point ever[y] doc has to admit they see these patients."

125. In the email, R.U. further instructed sales representatives to ask health care providers:

> Dr do you have patients that worry about what they can eat or can't eat? Do they worry about what may happen after eating?'
> ***
> Or are they still concerned about having diarrhea after they eat?... How would these patients like to eat Chinese or Mexican food with no worries of diarrhea?... This is a patient that deserve a chance on Viberzi!"  There's a ton of these patients out there that would sprint down to the physician's office to try a new medicine."

126. No representation or warning—however small—was ever mentioned about the fact that the drug was opiate-based or had addictive qualities.

127. At a sales force "plan of action" meeting attended by Allergan sales representatives including managers from the entire mid-south region, they were instructed to promote Viberzi to any patient with loose stools and belly pain, rather than limit the promotion of the drug as appropriate for patients who were diagnosed with IBS-D. Allergan managers warned its sales force to be wary of limiting the target market of the drug to IBS-D sufferers as "behind the game."

128. As a result of Regional Manager's G.F.'s instruction and insistence to sales representatives to make false representations about both the drug's potentially addictive opioid properties and the recommended profile of patients who should take Viberzi, Relator Jackson informed other Allergan managers and the Human Resources Department about Regional Manager's G.F's statements. He also informed them that that he believed he was being retaliated against for it.

129. In August 2016, an employee from Allergan's Human Resources Department (K.C.) sent Jackson an email asking to arrange a confidential phone call with Relator Jackson. During the meeting, K.C. asked Jackson if he felt G.F. was discriminating against him. Jackson replied that he was being "singled out for not promoting products 'off-label.'" Jackson further informed the HR Department that "off-label" promotion of Viberzi was occurring in his territory and that he believed the representations about the drug that were being made by

Allergan sales representatives were unlawful and potentially harmful to patients. K.C. responded that Allergan would take these allegations very seriously and that she was documenting his concerns.

130. In September 2016, Relator Jackson called the Allergan Regional Manager (J.M.) who was G.F.'s supervisor. Relator Jackson informed J.M. that G.F. was consistently encouraging sales representatives to promote Viberzi for off-label purposes and for patients who do not exhibit IBS-D symptoms. In this conversation, Relator Jackson also informed J.M. that G.F. was retaliating against him for refusing to downplay the dangerous contraindications and other warnings and precautions associated with Viberzi and refusing to promote Viberzi for off-label purposes. Despite receiving detailed information about the ongoing off-label promotion occurring in his territory, J.M. ignored Relator Jackson's concerns.

131. It was made clear at the meetings of Allergan sales representatives that they were expected to follow through with directives to avoid highlighting and to downplay any risks associated with taking Viberzi.

132. Defendants' directive to its salesforce was clear – broadly promote and induce physicians to prescribe Viberzi, playing on patients' discomfort caused by occasional diarrhea without mentioning the fact that the drug is opiate-based and has addictive qualities.

## C.   Allergan Paid Kickbacks to PARx to Further its Fraudulent Scheme

133.   Aggressive promotion of Viberzi for off-label uses was only part of Allergan's strategy.   Allergan believed it needed to do more to get these prescriptions filled.   And, the drugs carried a steep price tag to the federal, state and private health care insurers of over $1,000 per script.

134.   With the acquisition of Forest, Allergan was able to team with Forest's consulting partner, PARx, to work hurriedly to get Viberzi prescriptions filled for patients—again, without regard to the potentially addictive qualities of this opioid-based drug.

135.   On its website, PARx describes its mission this way: to help "prescribers overcome the cumbersome, frustrating and time-consuming challenges resulting from Prior Authorization."   (PARx Solutions website, http://www.parxsolutions.com/about/overview).

136.   Many private and public insurers require a physician to obtain prior authorization for certain drugs.   Prior authorizations have been used by the federal and state health care programs to reinforce provider awareness before prescribing opioid drugs because of the dangers of addiction, overuse, and death.   Prior authorizations require the prescriber to make express certifications about the appropriateness of a prescription before the pharmacy can dispense the drug to the beneficiary, including whether the beneficiary has exhausted other less dangerous

or less costly medical treatments and/or services.

137. Rather than protect patients and federal/state health care beneficiaries (or patients with private insurance in California and Illinois) as the prior authorization procedure was expressly designed to do, Defendants used the procedure to the opposite (and harmful) effect: to make it easier for individuals to obtain opioid-based prescriptions.

138. After the acquisition, the Allergan and Ironwood sales force was directed to market PARx' services to federal and state health care beneficiaries to push through as fast as possible prescriptions of Viberzi and other drugs when insurers required prior authorization.  The Allergan and Ironwood sales force marketed the services offered by PARx as "value add" to eliminate the burden on the health care provider to complete the claims forms for the opiate prescription drug Viberzi.

139. Not only did Allergan sales representatives market the services of this unrelated health care entity (PARx) to its health care providers, they often injected themselves into the prescribing process.  To hurry along and ensure the prescription for Viberzi was filled by the pharmacist and the drug was covered by the insurance plan, an Allergan sales representative would often race to the pharmacy ahead of the patient.  The prescription would be ready for the patient by the time the patient arrived at the pharmacy window.

140. Allergan's relationship with PARx appeared to be an improper kickback arrangement in violation of federal and state laws, and led to the submission of false claims to the government (federal and state) and private insurers in California and Illinois.

### D.   Allergan Paid Physicians Unlawful Kickbacks to Induce Them to Prescribe Viberzi and Linzess

141. Allergan paid doctors excessively and furnished them with lavish financial benefits under the guise of speaker programs, but with the intent to influence (or induce) the doctors to write more prescriptions for Viberzi and Linzess, among other drugs.

142. Certain of these prescriptions were reimbursed by the federal health care programs.  Still others were reimbursed by state health care programs or private insurers in California and Illinois.

143. Sales representatives identified local physicians as possible speakers based on their potential for writing Viberzi and Linzess prescriptions, among other drugs.

144. Allergan would then pay prescribing physician speakers between $1,200 - $2,500 per speaking engagement.

145. The speaking part of the engagement was cursory with prescribing physicians making an educational presentation for no more than ten or fifteen minutes (if at all), with the rest of the time spent enjoying an expensive meal and

alcohol.

146.  Even more informal speaker events often took place in a physician's office, and Allergan did not always follow through on its requirement that speakers provide a formal presentation or use a written presentation (by, for example, using a Power Point slide deck).

147.  Allergan's speaker rules were to require between two to three health care providers to attend these events for the speaker to be reimbursed, or for a catered lunch or dinner at a restaurant to be provided.  However, the attendees at these speaker events often included the same two to three health care providers who likely already heard the same presentation.

148.  The reality of these Allergan-paid speaker events was that they were a ruse to allow Allergan to reward and continue to induce high-prescribing physicians of Allergan's drugs who invited their friends and colleagues to join them.  Common locales were often steak houses and other formal dining places, and Allergan paid-physicians often brought friends, colleagues, and family members.

149.  Here are some examples of physicians who were induced to prescribe Linzess or Viberzi in exchange for speaker engagements that were a subterfuge for the inducements:

| Speaker Physician | Allergan Total Payment | Speaker Fees Payment | Travel Payment | Food Payment |
| --- | --- | --- | --- | --- |

| **Dr. D.M. Total Payments** | **$206,098.72** | **$140,750** | **$61,315.83** | **$4,032.89** |
|---|---|---|---|---|
| 2016 | $145,322.38[1] | $99,600 | $43,021.07 | $2,701.31 |
| December 2015 | $60,776.34 | $41,150 | $18,294.76 | $1,331.58 |
| **Dr. S.F. Total Payments** | **$180,710.92** | **$137,550** | **$40,740.07** | **$2,420.85** |
| 2016 | $130,422.34 | $99,500 | $29,344.05 | $1,578.29 |
| December 2015 | $50,288.58 | $38,050 | $11,396.02 | $842.56 |
| **Dr. B.C. Total Payments** | **$158,163.31** | **$131,237.35** | **$23,209.53** | **$3,716.43** |
| 2016 | $158,163.31 | $131,237.35 | $23,209.53 | $3,716.43 |
| **Dr. B.K.C. Total Payments** | **$89,390.78** | **$75,500** | **$12,714.89** | **$1,175.89** |
| 2016 | $87,641.47 | $74,000 | $12,465.58 | $1,175.89 |
| December 2015 | $1,749.31 | $1,500 | $249.31 | 0 |
| **Dr. P.B. Total Payments** | **$61,767.67** | **$59,300** | **$1,421.13** | **$1,064.58** |
| 2016 | $59,377.82 | $57,800 | $632.56 | $963.3[2] |
| December 2015 | $2,389.85 | $1500 | $788.57 | 101.28 |

[1] Includes $6.64 for "Education"
[2] Includes $24.04 paid by Ironwood Pharmaceuticals related to promotion of Viberzi and Linzess

| | | | | |
|---|---|---|---|---|
| | | | | |
| **Dr. R.B. Total Payments** | **$34,939.48** | **$26,600** | **$3,034.94** | **$1,179.54** |
| 2016 | $29,448.30 | $22,100 | $2,080.73 | $1,142.57 |
| December 2015 | $5,491.18 | $4,500 | $954.21 | $36.97 |

150.  As this chart shows, it was only possible for these physicians to earn such substantial amounts of money in speaker fees in a single year by holding multiple events each week.  Often, the chart shows, a physician was paid to speak at more than one event within a span of three days.

151.  Allergan was also strategic about the physicians it paid as speakers.

152.  For example, Dr. P.B. was a Memphis-based gastroenterologist who had a high volume of low-income patients.   This was a target population for Allergan because government health care insurance covered the entirety of their prescriptions for drugs.   As a result, Dr. P.B. became one of Allegan's most frequently paid speaker in the Memphis-area.

153.  Allergan paid Dr. P.B. to speak at numerous events, with dinner tabs more than $1,000 per event. Allergan also paid for Dr. P.B. and his staff to have breakfasts and lunches catered in his office.  Dr. P.B. was rarely required to make formal (or educational) presentations in exchange for his expensive dinners and catered lunches.

154. Dr. P.B. knew why Allergan was paying him and knew there was a

quid pro quo for his acceptance of these expensive meals.  When Allergan informed Dr. P.B. in early February 2016, that it expected him to write more Viberzi prescriptions, Dr. P.B. promptly instructed his nurse to work with the Allergan sales representative to ensure "pull through" with the pharmacies—in other words, ensure that the Viberzi prescriptions were being filled.

155. After that meeting, Dr. P.B.'s Viberzi prescriptions increased dramatically.

156. As described, in addition to inducing physicians to prescribe drugs (including Viberzi and Linzess) by paying them money disguised as speaker fees, Allergan remunerated health care providers through catered lunches and parties.

157. Dr. D.M. is another example.  He was one of the highest paid speakers for Viberzi in the first 13 months of the drug's launch.  Dr. D.M. was paid over $200,000.  Allergan characterized over $140,000 of the payments as speaker honoraria and $60,000 as travel expenses.

158. When Dr. D.M. described Viberzi at these events to other providers, he would not disclose that the drug was listed by the DEA as a Schedule IV controlled substance or that it had addictive properties.

159. Instead, during his frequent engagements on behalf of Viberzi, Dr. D.M. used a slide deck that could be described as off-color (rather than scientific or educational) and included personal photos and stories about himself.

160. For example, slide decks showed photos of Dr. D.M. standing in front

of lewd venues or in athletic gear.

161. Allergan had a chauffeur drive Dr. D.M. to these paid engagements, which often involved lunch and dinner paid by Allergan on the same day.

162. Very quickly Dr. D.M. became one of the largest prescribers of Viberzi.

163. As with Dr. P.B.'s staff, Dr. D.M.'s staff worked with the Allergan sales representatives to ensure the pharmacies were filling the prescriptions.

164. Defendants meticulously tracked daily and weekly sales of drugs by region and salesperson, and financially rewarded salespeople and regions that successfully promoted and sold the drug, as reflected in record sales.  In one example, because of Relator Wilkerson's success in exceeding his sales target, he became a member of the "President's Club" and was awarded with an all-expense paid trip to Hawaii and $25,000 in stock options.

165. Defendants benefitted financially from their unlawful marketing and sales tactics.  Within a few short months after the FDA approval of Viberzi, more than 60,000 Viberzi prescriptions were filled because of Allergan's aggressive marketing and sales push.

**E.    Defendants Inserted Themselves into the Insurer's Payment Process to Make Sure the Patients Got the Drugs Allergan and Ironwood Were Promoting**

166. When Viberzi was first launched, it did not initially appear on Medicare Part D (prescription drug plan) formularies, which generally means

Medicare did not cover the cost of the drug for patients.  With a price tag of over $1,000 for a 30-day supply, Allergan knew patients wouldn't be able to afford the drug.   Allergan was strategic about finding ways to get the drug covered by an insurer.

167.  Allergan offered health care providers "first month free vouchers"—a free one- month prescription for Viberzi.  The drug was pushed on patients for "free" at the get-go, with Allergan's full knowledge that Viberzi is opioid-based and potentially addictive.

168.  Relator Wilkerson was instructed to beat patients to the pharmacy to provide the pharmacist with a "first month free voucher."  This would prevent the patient from learning about cost of the drug and avoid sticker shock.  This was a successful strategy with high-prescribing physician offices.  They would notify Relator Wilkerson when they were filling the prescriptions, as part of the "pull through" pharmacy initiative.

169.  Further, although Viberzi did not appear on the Medicare Part D formulary, certain Part D plans (e.g., the Humana Walmart Rx Plan), would allow coverage if the prescription was "prior authorized."  (Prior authorization is a requirement by some insurers that the physician obtain advance approval from the health insurance plan to prescribe a specific medication).  Allergan partnered with PARx to ensure that in exchange for Allergan's marketing of PARx services, PARx systematically completed the necessary prior authorization paperwork to

allow for coverage of Viberzi by certain Part D plans—and to make sure that PARx acted speedily.

170.  Also, strategically, Allergan facilitated getting the drug's coverage for low income patients through a program called the Medicare Extra Help program. The Medicare Extra Help program helps certain qualified individuals pay their drug premiums.  Medicaid recipients and certain other qualified low-income patients who otherwise don't qualify for federal programs like Medicaid are eligible.  The government subsidizes most of the prescription drug cost and the low-income patient is only required to pay less than $10 for each drug claim, even when the drug costs are as high as $1,000 per script.

171.  Relators Jackson and Wilkerson were directed by Allergan supervisors to specifically target physicians with high percentages of elderly low-income patient populations who were likely to qualify for the Medicare Extra Help program.

172.  For example, Dr. H.S. in Ft. Smith, Arkansas was a primary target of Allergan's inducements to write prescriptions because an estimated 80 percent of his patient population was eligible for Medicaid or low-income subsidy programs such as the Medicare Extra Help program.

173.  Similarly, Dr. P.B. was targeted by Allergan for unlawful inducements because he could prescribe Viberzi or Linzess to low-income patients who could get drug coverage.

174. Allergan also expected its sales representatives to help patients complete the Medicare Extra Help paperwork.

175. Allergan's marketing efforts weren't limited to federal or state beneficiaries.  It also aggressively targeted private pay beneficiaries, particularly because of the initial coverage limitations for Medicare patients when Viberzi was first launched.  During the early launch of the drug, Allergan sales representatives were authorized to provide private beneficiaries with copay assistance cards – essentially waiving the patient's copay obligations while the private insurer was obligated to foot the remainder of the costly $1,000+ charge.  Furthermore, these copay assistance cards allowed patients to have the $1,000+ cost of one month's prescription of Viberzi applied to the patient's yearly health insurance deductible.  This encouraged people to try the drug free of charge and receive a $1,000+ credit toward yearly health care costs, even though this was a potentially addictive drug.

176.  All the while Allergan was trying to lure providers and patients to the drugs with financial assistance, it was increasing its lobbying efforts to get Viberzi on the Medicare formulary as soon as possible.

177. Allergan's overall strategy to expand its market for Linzess and Viberzi well beyond the population of patients with IBS-D and IBS-C has been with the full knowledge that Viberzi is an opioid drug with potentially harmful and addictive qualities.

### F.   Defendants Knew that Compliance with the Relevant Laws Was Material to the Government's Decision to Pay Because They Went to the Essence of the Government's Bargain for Which it was Paying for Drugs

178. The allegations of Defendants' fraudulent off-label marketing and violations of the Anti-Kickback Statute set forth in detail in this Complaint go to the heart of the governments' and private insurers' benefit of the bargain to cover and pay for costly drugs like Viberzi, Linzess, and others sold by Allergan for its beneficiaries.

179. The government and private insurers expect decisions to be made about the most optimal course of treatment for patients to be free of improper influence or inducement.

180.  Deciding upon the best course of treatment for a disease, including IBS-D and IBS-C, is often fraught with apprehension and uncertainty.  Because patients rarely possess the comprehensive medical knowledge necessary to evaluate all their available options, they rely upon their physician's expertise to guide them through a decision-making process that identifies a personalized treatment plan.  A sense of trust and mutual respect between the patient and physician is critical to this process.

181. It is therefore important to the government (and private insurers) to guard against attempts to influence the physician's treatment recommendations by those who might benefit financially, especially in the form of kickback

arrangements to the physician or other health care partners that participate in federal health care programs.

182. The government prohibits pharmaceutical companies from providing financial incentives to the physician in return for writing prescriptions for their drugs, particularly when those drugs are potentially dangerous, being prescribed for off-label use, or unnecessary for a patient's treatment.

183. The FDA is responsible for approving drugs as safe and effective for specified uses. Under the Food, Drug and Cosmetic Act, a company in its application to the FDA must specify each intended use of a drug. A company's promotional activities must be limited to only the intended uses that FDA approved. In fact, promotion by the manufacturer for other uses - known as "off-label" uses - renders the product misbranded.

184. Off-label marketing undermines the drug approval process. The FDA closely scrutinizes the sales and marketing practices of pharmaceutical companies that put profits ahead of patient health and that undermine the drug approval process.

185. The Complaint alleges that not only did Defendants engage in off-label promotion, but it targeted low-income patients and downplayed all the risks associated with an opioid-based drug.

186. As shown in this Complaint, Defendants' strategic off-label marketing, coupled with their kickback scheme, went to the essence of the bargain

for which the Government (and private insurers) were paying claims for drugs.

187.  Defendants' violations were serious and material, leading to actual or potential patient harm, and not merely technical or minor infractions of rules. Defendants' violations were made with actual knowledge of the seriousness of their violations, and not simply a case of a defendant acting with reckless disregard.

188.  The promotion of drugs for their intended uses (as approved by the FDA) and free and clear of financial inducements was intrinsic to the purpose of the federal and state health care drug programs.

189.  Defendants knew (or should have known) that these violations were material to the Government's decision to pay.

190.  In short, there is more than ample evidence to show that Defendants knew or should have known that their violations had the natural tendency to influence the government's decision to pay the Medicare, Medicaid, TRICARE, and other federal health care program claims (and state claims and private insurance claims) and that any reasonable person would attach importance to Defendants' choice of actions.

### G.    Defendants' Alleged Scheme Would Violate a Corporate Integrity Agreement with HHS-IG

191. Since as far back as September 2010, Allergan's now-subsidiary, Forest Pharmaceuticals, was subject to the terms of an extended corporate integrity

agreement (CIA) with the Office of Inspector General of the United States Department of Health and Human Services. The CIA resulted from Forest's guilty plea to charges related to obstruction of justice, unapproved distribution of a new drug (Levothroid), and illegal promotion of an antidepressant (Celexa) to children and adolescents, and its payment of more than $313 million to also resolve False Claims Act allegations involving off-label marketing and kickbacks of the same drugs.

192. Allergan's CIA may still be in place because of the company's recent False Claims Act settlement. In December 2016, Forest paid another $38 million to resolve False Claims Act allegations involving kickbacks paid to induce physicians to prescribe the drugs Bystolic, Savella, and Namenda. https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations

193. The making of false statements and submission of false claims, including based upon the unlawful kickbacks, as alleged in this case, would violate the express terms of an existing CIA, which requires annual certifications of compliance in reports to HHS-IG. False certifications by Defendants in these annual reports would provide an independent basis for liability under the False Claims Act. *See U.S. ex rel. Matheny, et al. v. Medco Health Solutions, Inc., et al.*, Case No. 10-15404 (11th Cir. 2012).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## H.    Defendants Unlawfully Retaliated Against Relator Jackson

194.  As set forth in this Complaint, Relator Jackson was concerned that Defendants were illegally promoting Viberzi and other drugs.  He worried that Defendants' sales and marketing strategy was not only unlawful but may result in harm to patients who took Viberzi.

195.  While promoting and selling Viberzi, supervisor G.F. directed Relator Jackson to not raise with doctors the contraindications and potential dangers associated with Viberzi, and to minimize the potential risks if the conversations with health care providers arose.   G.F.'s directive was consistent with Allergan's aggressive marketing and sales strategy.

196.  Jackson was reprimanded and retaliated against by G.F. and Allergan because he described the drug and its properties truthfully, limited his marketing pitches to on-label uses, and objected to making false representations to health care providers about the drugs' harmful properties.

197.  In January 2016, G.F. came to Fort Smith, Arkansas to conduct a field-ride training session with Jackson.   During the training, Jackson was inappropriately instructed by G.F. to (a) recommend Viberzi for patients who were not recommended to take Viberzi and (b) disregard Viberzi's contraindications, addictive properties and side effects.

198.  G.F. reprimanded Jackson for discussing contraindications with medical staff at several health care providers' offices.  G.F. went even further and

advised Jackson that he would be filling out a coaching report about Jackson based his refusal to go along with G.F.'s directives to make false representations about Viberzi, and that the report was going to "sting."

199.  Through 2016, a pattern developed of G.F. reprimanding Jackson for his refusal to disregard the appropriate patient profile, warnings and precautions of Viberzi and Jackson sticking to his guns of making full disclosure of Viberzi's appropriate patient profile, contraindications and warnings.  During 2016, G.F. wrote two negative performance reviews of Jackson, in addition to the negative coaching report after the field-ride.

200.  G.F.'s negative performance review of Jackson was nothing more than retaliation for Jackson's refusal to improperly promote and make false representations that downplayed the contraindications of Viberzi.

201.  Jackson informed other Allergan managers and the Human Resources Department that G.F. was directing him to make false representations about both the drug's potentially addictive opioid properties and the recommended profile of patients who should take Viberzi.  Relator Jackson also informed them that that he believed he was being retaliated against for it.

202.  In August 2016, an employee from Allergan's Human Resources Department (K.C.) sent Jackson an email asking to arrange a confidential phone call with Relator Jackson.  During the meeting, K.C. asked Jackson if he felt G.F. was discriminating against him.  Jackson replied that he was being "singled out

for not promoting products 'off-label.'"   Jackson further informed the HR Department that "off-label" promotion of Viberzi was occurring in his territory and that he believed the representations about the drug that were being made by Allergan sales representatives were unlawful and potentially harmful to patients. K.C. responded that Allergan would take these allegations very seriously and that she was documenting his concerns.

203. In September 2016, Relator Jackson called the Allergan Regional Manager (J.M.) who was G.F.'s supervisor.  Relator Jackson informed J.M. that G.F. was consistently encouraging sales representatives to promote Viberzi for off-label purposes and for patients who do not exhibit IBS-D symptoms.  In this conversation, Relator Jackson also informed J.M. that G.F. was retaliating against him for refusing to downplay the dangerous contraindications and other warnings and precautions associated with Viberzi and refusing to promote Viberzi for off-label purposes.  Despite receiving detailed information about the ongoing off-label promotion occurring in his territory, J.M. ignored Relator Jackson's concerns.

204. Relator Jackson's objections to improperly promoting Viberzi was met with hostility and disregard until he was ultimately terminated by Allergan.

205. On January 20, 2017, G.F. and an Allergan Human Resources employee (B.M.) informed Relator Jackson that he was being dismissed for "Not Meeting Expectations."

206. In fact, Allergan terminated Relator Jackson in retaliation for his

refusal to engage in fraudulent behavior.

207. There are several performance measures, which Relator Jackson met and exceeded, that demonstrate that Jackson was a highly capable and productive sales representative and was not fired because of his ability to perform.

208. For example, in early 2016 when Relator Jackson was raising the concerns alleged in the Complaint, Jackson was recognized by an area business director who was in a position of authority over Jackson (C.S., the Area Business Director for the Mid-South Region), as a "mover and shaker," an award bestowed upon top Allergan Sales Representatives whose performance was in the top 13 percent of sales, nationally.

209. Further demonstrating his productivity during the time G.F. was his supervisor, Relator Jackson was in the top 50 percent in sales in the United States for the top three products he marketed and sold; and, in the top 15 percent of sales in Linzess and the top 42 percent in sales of Viberzi.

210. Relator Jackson also received his fourth quarter of 2016 bonus after his termination. This bonus was earned during October through December of 2016, the time directly prior to his termination in January 2017. Under Allergan's policy, employees must be in good standing and not on a performance plan to receive a quarterly bonus.

211. As alleged, Jackson engaged in protected activity by: (a) refusing to cause the submission of false claims for payment to the government for drug

reimbursement, and (b) informing individuals in Allergan's Human Resources Department and other sales and marketing managers of his belief that Defendants were unlawfully promoting and selling Viberzi, leading to inappropriate prescriptions being written for such patients.  Further, Jackson was terminated in direct retaliation for engaging in such protected activity.

212.  In summary, Relator Jackson was unlawfully discharged for engaging in protected activity, namely for raising, objecting to, refusing to participate in, and trying to stop fraudulent conduct alleged in this Complaint that violates the False Claims Act.

213.  For the reasons set forth in this Complaint, Relator Jackson is entitled to reinstatement, double the amount of back pay, interest on the back pay and compensation for any special damages sustained as a result of the discrimination including litigation costs and reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3729(h).

## COUNT I

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(A)

214. The allegations in the preceding paragraphs are incorporated by reference.

215.  Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

216.  By virtue of the kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of drugs on behalf of federal health care program beneficiaries.

217. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the drug claims.

218.  Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

219.  As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT II

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(B)

220. The allegations in the preceding paragraphs are incorporated by reference.

221.  Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729

(a)(1)(B).

222.  By virtue of the kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim for the improper payment or approval of drugs on behalf of federal health care program beneficiaries.

223.  The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the drug claims.

224.  Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

225.  As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT III
### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(C)
### Conspiracy

226.  The allegations in the preceding paragraphs are incorporated by reference.

227.  Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(C).

228.  By virtue of kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly conspired to commit violations of the False Claims Act for the improper payment or approval of drugs on behalf of federal health care program beneficiaries.

229.  The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the drug claims.

230.  Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

231.  As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

**COUNT IV**

**Federal False Claims Act:**
**31 U.S.C. § 3729(a)(1)(G)**

232.  The allegations in the preceding paragraphs are incorporated by reference.

233.  Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(G).

234.  By virtue of kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

235.  The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the drug claims.

236.  Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

237.  As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

# COUNT V

## Federal False Claims Based on Anti-Kickback Statute
## 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)

238.   The allegations in the preceding paragraphs are incorporated by reference.

239.   Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(A).

240.   By virtue of the kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of drugs on behalf of federal health care program beneficiaries.

241.   The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the drug claims.

242.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

243. As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT VI

### Arkansas State Medicaid Fraud False Claims Act, Ark. Code § 20-77-900, et seq.

244. The allegations in the preceding paragraphs are incorporated by reference.

245. Relators also bring this action on behalf of the State of Arkansas, against Defendants under the Arkansas State Medicaid Fraud False Claims Act ("FCA"), Ark. Code § 20-77-900 et seq.

246. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Arkansas FCA, Ark. Code § 20-77-902, which create liability for any person who:

> **(1)** Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;

> **(2)** At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;

> **\*\*\***

> **(6)** Knowingly solicits or receives any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind:

**(A)** In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or

**(B)** In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program;

**(7) (A)** Knowingly offers or pays any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce the person:

**(i)** To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or

**(ii)** To purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program.

247. Pursuant to the Arkansas FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ark. Code § 20-77-900 *et seq*.

248. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT VII

### California False Claims Act,
### Cal. Gov't Code § 12650, et seq.

249. The allegations in the preceding paragraphs are incorporated by

reference.

250. Relators also bring this action on behalf of the State of California, against Defendants under the California False Claims Act ("FCA"), Cal. Gov't Code § 12652(c).

251. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

252. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

253. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly

avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision."

254. Pursuant to the California FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Cal. Gov't Code § 12651(a)(1).

255. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT VIII

### Delaware False Claims & Reporting Act, Del. Code Ann. Tit. 6 § 1201, et seq.

256. The allegations in the preceding paragraphs are incorporated by reference.

257. Relators also bring this action on behalf of the Government of the State of Delaware, against Defendants under the State of Delaware's False Claims and Reporting Act ("FCA"), Del. Code Ann. tit. 6, § 1203(b)(1).

258. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented a false or fraudulent claim for payment or approval."

259. Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(2), which creates liability for any person who "[k]nowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

260. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

261. Pursuant to the Delaware FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Del. Code Ann. tit. 6, §1201(a).

262. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT IX

### Florida False Claims Act,
### Fla. Stat. § 68.081, et seq.

263. The allegations in the preceding paragraphs are incorporated by reference.

264.  Relators also bring this action on behalf of the State of Florida, against Defendants under the State of Florida's False Claims Act ("FCA"), Fla. Stat. § 68.083(2).

265.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(a), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

266.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

267.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(g), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

268. Pursuant to the Florida FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Fla. Stat. § 68.082(2).

269. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT X

### Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168, et seq.

270. The allegations in the preceding paragraphs are incorporated by reference.

271. Relators also bring this action in the name of the State of Georgia, against Defendants pursuant to the State of Georgia False Medicaid Claims Act ("FMCA"), O.C.G.A. § 49-4-168 *et seq.*

272. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval."

273. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(2), which creates liability for any person who

"[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

274.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program."

275.  Pursuant to the Georgia FMCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law.  O.C.G.A. § 49-4-168.1(a).

276.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XI

### Illinois False Claims Act,
### 740 Ill. Comp. Stat. 175/1, et seq.

277. The allegations in the preceding paragraphs are incorporated by reference.

278.  Relators also bring this action on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act ("FCA"), 740 Ill. Comp. Stat. 175/4(b).

279.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(A), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

280.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(B), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

281.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(G), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

282. Pursuant to the Illinois FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. 740 Ill. Comp. Stat. 175/3(a).

283. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XII

### Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7, et seq.

284. The allegations in the preceding paragraphs are incorporated by reference.

285. Relators also bring this action on behalf of the State of Indiana, against Defendants under the State of Indiana False Claims and Whistleblower Protection Act ("FCA"), Ind. Code § 5-11-5.7-4(a).

286. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(l), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

287. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(2), creates liability for any person who "knowingly makes,

uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim."

288.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), which creates liability for any person who "(A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

289.  Pursuant to the Indiana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ind. Code § 5-11-5.5-2(b).

290.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIII
### Iowa False Claims Act,
### Iowa Code § 685.1, et seq.

291.  The allegations in the preceding paragraphs are incorporated by reference.

292.  Relators also bring this action on behalf of the State of Iowa, against Defendants under the State of Iowa False Claims Act ("FCA"), Iowa Code §

685.3(2)a.

293.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code § 685.2(1)a, which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

294.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code § 685.2(1)b, which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

295.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code § 685.2(1).g, which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

296. Pursuant to the Iowa FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are

liable to the State for treble damages, civil penalties, and all other relief authorized by law. Iowa Code § 685.2(1).

297.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

**COUNT XIV**

**Louisiana Medical Assistance Programs Integrity L aw,
La. Rev. Stat. Ann. § 46:437.1, et seq.**

298.  The allegations in the preceding paragraphs are incorporated by reference.

299.  Relators also bring this action on behalf of the State of Louisiana's medical assistance programs, against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law ("FCA"), La. Rev. Stat. Ann. § 46:439.1.A.

300.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.A, which states that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim."

301.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.B, which states that "[n]o person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim."

302.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.C, which states that "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs."

303.  Pursuant to the Louisiana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. La. Rev. Stat. Ann. § 46:438.6.

304.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XV

### Maryland False Health Claims Act,
### Md. Code Ann. Health-Gen. § 2-601, et seq.

305.  The allegations in the preceding paragraphs are incorporated by reference.

306.  Relators also bring this action on behalf of the State of Maryland, against Defendants under the State of Maryland False Health Claims Act ("FCA"), Md. Code Ann. Health-Gen. § 2-604(a)(1).

307. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(1), which states that a person may not "[k]nowingly present or cause to be presented a false or fraudulent claim for payment or approval."

308. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(2), which states that a person may not "[k]nowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim."

309. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(7), which states that a person may not "[k]nowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State."

310. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(8), which states that a person may not "[k]nowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State."

311.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(9), which states that a person may not "[k]nowingly make any other false or fraudulent claim against a State health plan or a State health program."

312.  Pursuant to the Maryland FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Md. Code Ann. Health-Gen. § 2-602(b).

313.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XVI

**The Commonwealth of Massachusetts False Claims Act,**
**Mass. Ann. Laws Ch. 12, § 5A, et seq.**

314. The allegations in the preceding paragraphs are incorporated by reference.

315.  Relators also bring this action on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act ("FCA"), Mass. Ann. Laws ch. 12, § 5C(2).

316.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(1), which creates liability for any person who

"knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

317.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(2), creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

318.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(9), which creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof."

319.  Pursuant to the Massachusetts FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mass. Ann. Laws ch. 12, § 5B(a).

320.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT XVII

### Michigan Medicaid False Claims Act,
### Mich. Comp. Laws Serv. § 400.601, et seq.

321. The allegations in the preceding paragraphs are incorporated by reference.

322. Relators also bring this action in the name of the State of Michigan, against Defendants under the State of Michigan Medicaid False Claims Act ("FCA"), Mich. Comp. Laws Serv. § 400.610a(l).

323. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Michigan FCA, Mich. Comp. Laws Serv. § 400.603(1)-(3):

> "(1)   A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.
>
> (2)      A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.
>
> (3)      A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled."

324. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(1), which states that "[a] person shall not make

or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false."

325.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(3), which states that "[a] person shall not knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act."

326.  Pursuant to the Michigan FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mich. Comp. Laws. Serv. § 400.612.

327.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XVIII

### Missouri Health Care Payment Fraud and Abuse Statute, MO Rev. Code § 191.900, et seq.

328.  The allegations in the preceding paragraphs are incorporated by reference.

329.  Relators also bring this action on behalf of the State of Missouri, against Defendants under the Missouri Health Care Payment Fraud and Abuse

Statute ("FCA"), MO Rev. Code § 191.900, *et seq.*

330. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Missouri FCA, MO Rev. Code § 191.905, which create liability for any person who:

> 91.905. 1. No health care provider shall knowingly make or cause to be made a false statement or false representation of a material fact in order to receive a health care payment, including but not limited to:
>
> (1) Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not;
>
> (2) Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment made by a health care payer for providing health care;
>
> (3) Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled;
>
> \*\*\*
>
> 2. No person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for:
>
> (1) Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

(2) Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

3. No person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

331. Pursuant to the Missouri FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. MO Rev. Code § 191.905.

332. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIX

### Montana False Claims Act,
### Mont. Code Ann. § 17-8-401, et seq.

333. The allegations in the preceding paragraphs are incorporated by reference.

334. Relators also bring this action on behalf of the State of Montana, against Defendants under the State of Montana False Claims Act ("FCA"), Mont. Code Ann. § 17-8-406(1).

335. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of

the Montana FCA, Mont. Code Ann. § 17-8-403(1), which create liability for any

person who:

> "(a)    knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

> (b)    knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

> …

> (g)    knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity."

336. Pursuant to the Montana FCA, based on Defendants' material non-disclosures

and other wrongful acts and omissions set forth above, Defendants are liable to the

State for treble damages, civil penalties, and all other relief authorized by law.

Mont. Code Ann. § 17-8-403(2).

337. As a result of Defendants' violations, the state has suffered damages

in an amount to be determined at trial.

## COUNT XX

### Nevada Submission of False Claims to
### State or Local Government Act,
### Nev. Rev. Stat. § 357.010, et seq.

338. The allegations in the preceding paragraphs are incorporated by

reference.

339. Relators also bring this action on behalf of the State of Nevada, against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act ("FCA"), Nev. Rev. Stat. § 357.080(1).

340. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Nevada FCA, Nev. Rev. Stat. § 357.040(l), which create liability for any person who:

> "(a)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (b)   Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.
> …
>
> (f)   Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision; or
>
> (g)   Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

341. Pursuant to the Nevada FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Nev. Rev. Stat. § 357.040(2).

342.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXI

### New Hampshire False Claims Act,
### N.H. Rev. Stat. Ann. § 167:61-B, et seq.

343.  The allegations in the preceding paragraphs are incorporated by reference.

344.  Relators also bring this action on behalf of the State of New Hampshire, against Defendants under the State of New Hampshire False Claims Act ("FCA"), N.H. Rev. Stat. Ann. § 167:61-b, *et seq.*

345.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of The New Hampshire FCA, N.H. Rev. Stat. Ann. § 167:61-b, which create liability for any person who:

> "(a)    Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.
>
> (b)     Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.
> …
>
> (d)     Has possession, custody, or control of property or money used, or to be used, by the department and, intending to defraud the department or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt.

(e)    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the department; or

(f)    Is a beneficiary of an inadvertent submission of a false claim to the department, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the department within a reasonable time after discovery of the false claim."

346. Pursuant to the New Hampshire FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.H. Rev. Stat. Ann. § 167:61-b, *et seq.*

347. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXII

### New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, et seq.

348. The allegations in the preceding paragraphs are incorporated by reference.

349. Relators also bring this action in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey False Claims Act ("FCA"), N.J. Stat. Ann. § 2A:32C-5.b.

350. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of

The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3, which create liability for any person who:

> "a.      Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;
>
> b.      Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;
> …
> g.      Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State."

351.  Pursuant to the New Jersey FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.J. Stat. Ann. § 2A:32C-3.

352.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIII

### New Mexico Medicaid False Claims Act,
### N.M. Stat. Ann. § 27-14-1, et seq.

353.  The allegations in the preceding paragraphs are incorporated by reference.

354.  Relators also bring this action on behalf of the State of New Mexico, against Defendants under the State of New Mexico Medicaid False Claims Act ("FCA"), N.M. Stat. Ann. § 27-14-7.B.

355.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New Mexico FCA, N.M. Stat. Ann. § 27-14-4, which create liability for any person who:

> "A.    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;
>
> B.    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;
>
> C.    makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false; [or]
>
> …
> E.        makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false."

356. Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

357.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

# COUNT XXIV

## North Carolina False Claims Act,
## N.C. Gen. Stat. § 1-605, et seq.

358. The allegations in the preceding paragraphs are incorporated by reference.

359. Relators also bring this action on behalf of the State of North Carolina, against Defendants under the State of North Carolina False Claims Act ("FCA"), N.C. Gen. Stat. § 1-608(b).

360. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the North Carolina FCA, N.C. Gen. Stat. § 1-607(a), which create liability for any person who:

> "(1)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (2)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
> …
> (7)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

361. Pursuant to the North Carolina FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.C. Gen. Stat. § 1-607(a).

362.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXV

## Oklahoma Medicaid False Claims Act,
## Okla. Stat. Tit. § 63-5053, et seq.

363.  The allegations in the preceding paragraphs are incorporated by reference.

364.  Relators also bring this action in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid False Claims Act ("FCA"), Okla. Stat. tit. § 63-5053.2(B).

365.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Oklahoma FCA, Okla. Stat. tit. § 63-053.1(B), which create liability for any person who:

> "1.    Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;
>
> 2.    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;
> … or
>
> 7.    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state."

366.  Pursuant to the Oklahoma FCA, based on Defendants' material non-

disclosures and other wrongful acts and omissions set forth a in an amount to be determined at trial.

## COUNT XXVI

### Rhode Island False Claims Act,
### R.I. Gen. Laws § 9-1.1-1, et seq.

367. The allegations in the preceding paragraphs are incorporated by reference.

368. Relators also bring this action in the name of the State of Rhode Island, against Defendants pursuant to the State of Rhode Island False Claims Act ("FCA"), R.I. Gen. Laws § 9-1.1-4(b).

369. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a), which create liability for any person who:

> "(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (2)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> …
> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state…."

370. Pursuant to the Rhode Island FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. R.I. Gen. Laws § 9-1.1-3(a).

371. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXVII

### Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, et seq.

372. The allegations in the preceding paragraphs are incorporated by reference.

373. Relators also bring this action in the name of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act ("FCA"), Tenn. Code Ann. § 71-5-183(b)(1).

374. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l), which create liability for any person who:

> "(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;
>
> (B)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program; [or]

(C)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program."

375.   Pursuant to the Tennessee FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tenn. Code Ann. § 71-5-182(a).

376.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXVIII

### Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, et seq.

377.   The allegations in the preceding paragraphs are incorporated by reference.

378.   Relators also bring this action in the name of the State of Texas, against Defendants under the State of Texas Medicaid Fraud Prevention Act ("FCA"), Tex. Hum. Res. Code § 36.101(a).

379.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of

the Texas FCA, Tex. Hum. Res. Code § 36.002, which create liability for any person who, *inter alia*:

> "(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

> (2)   knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

> (3)   knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;
> …

> (12)   knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

> (13)   knowingly engages in conduct that constitutes a violation under Section 32.039(b)."

380. Pursuant to the Texas FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tex. Hum. Res. Code § 36.052.

381. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIX

### Vermont False Claims Act,
### Vt. Stat. Tit. 32, 630, et seq.

382. The allegations in the preceding paragraphs are incorporated by reference.

383. Relators also bring this action in the name of the State of Vermont, against Defendants under the State of Vermont False Claims Act ("FCA"), Vt. Stat. Ann. tit. 32, § 632(b).

384. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Vermont FCA, Vt. Stat. Ann. tit. 32, § 631, which state that no person shall:

> "(1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

> (2)  knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

> …

> (8)    enter into a written agreement or contract with an official of the State or its agent knowing the information contained therein is false;

> (9)    knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State; [or]

> (10)  knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

385.  Pursuant to the Vermont FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Vt. Stat. Ann. tit. 32, § 631(b).

386.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXX

### The Commonwealth of Virginia
### Fraud Against Taxpayers Act,
### Va. Code Ann. § 8.01-216.1, et seq.

387.  The allegations in the preceding paragraphs are incorporated by reference.

388.  Relators also bring this action on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act ("FCA"), Va. Code Ann. § 8.01-216.5(A).

389.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Virginia FCA, Va. Code Ann. § 8.01-216.3(A), which create liability for any person who:

> "1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> 2.      Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> …

7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth."

390.  Pursuant to the Virginia FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Va. Code Ann. § 8.01-216.3(A).

391.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XXXI

**Washington State Medicaid Fraud False Claims Act,
Wash. Rev. Code § 74.66.005, et seq.**

392.  The allegations in the preceding paragraphs are incorporated by reference.

393.  Relators also bring this action on behalf of the State of Washington, against Defendants under the Washington State Medicaid Fraud False Claims Act ("FCA"), Wash. Rev. Code § 74.66.050(1).

394.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Washington FCA, Wash. Rev. Code § 74.66.020(1), which create liability for any person who:

"(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

(g)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity."

395.  Pursuant to the Washington FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wash. Rev. Code § 74.66.020(1).

396.  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXXII

### California Insurance Frauds Prevention Act,
### California Insurance Code § 1871.7(a) & (b)

397.  The allegations in the preceding paragraphs are incorporated by reference.

398.  Relators also bring this action for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. § 1871.7, as amended ("CIFPA").  The CIFPA provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549

or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim, as may be amended.  Cal. Ins. Code § 1871.7(b).

399.  Subsection (e) of Cal. Ins. Code § 1871.7 provides for a qui tam civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud.  Cal. Ins. Code § 1871.7(e).  The qui tam provision was patterned after the Federal False Claims Act, 31 U.S.C. §§ 3729-32, and the California False Claims Act, Cal. Gov't Code §§12650 *et seq.*

400.  Subsection (b) of Cal Ins. Code § 1871.7 provides for civil recoveries against person who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits certain activities, including violations of 550(a)(5)-(6), (b)(1), (2), and (3).

401.  By virtue of the acts described in this Complaint, Defendant caused to be presented, or knowingly assisted or conspired in presenting or causing to be presented, to the insurers in the State of California fraudulent claims that were induced by payments of kickbacks to physicians, in violation of Penal Code § 550 (b)(1), among other provisions.

402.  By virtue of the acts described in this Complaint, Defendants also concealed and/or failed to disclose information that would have affected the rights

[SEALED] *QUI TAM* COMPLAINT - 98

of pharmacies to receive reimbursement for prescriptions, in violations of Penal Code § 550(a).

403. Each claim for reimbursement that was inflated as a result of Defendants' illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

404. Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

405. The payment of the kickbacks alleged in this Complaint represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

406. Moreover, the payment of these kickbacks violates the "runners and cappers" provision of § 1871.7(a), as Defendants' kickback scheme was to "procure clients or patients to obtain services or benefits under a contract of insurance." In the alternative, Defendants' payment of kickbacks violated the "runners and cappers" § 1871.7(a), as Defendants' employment of sales representatives to provide kickbacks to physicians in order to generate prescriptions that would eventually be paid for by private insurance companies constitutes the unlawful and knowing employment of "runners, cappers, steerers,

or other persons ... to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." The Commissioner and Relators know and believe that these practices continued beyond the time at which they were employed at Allergan, and upon information and belief, this pattern and practice continues to the present.

407. The payment of the kickbacks alleged in this Complaint represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

408. Moreover, the payment of these kickbacks violates the "runners and cappers" provision of § 1871.7(a), as Defendants' kickback scheme was to "procure clients or patients to obtain services or benefits under a contract of insurance." In the alternative, Defendants' payment of kickbacks violated the "runners and cappers" § 1871.7(a), as Defendants' employment of sales representatives to provide kickbacks to physicians in order to generate prescriptions that would eventually be paid for by private insurance companies constitutes the unlawful and knowing employment of "runners, cappers, steerers, or other persons ... to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against

an insured individual or his or her insurer." The Commissioner and Relators know and believe that these practices continued beyond the time at which they were employed at Allergan, and upon information and belief, this pattern and practice continues to the present.

409. The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code § 1871.7. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged.

## COUNT XXXIII

### Illinois Insurance Frauds Prevention Act
### 740 Ill. Comp. Stat § 92

410. The allegations in the preceding paragraphs are incorporated by reference.

411. Relators also bring this action for treble damages and penalties under the Illinois Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92

412. Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides: A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

413. Article 46 of the Illinois Criminal Code, referenced in the above-quoted section, provides criminal penalties for any person who commits the offense of insurance fraud, defined in the statute as follows: (a) A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company.... 720 Ill. Comp. Stat. §5/46-1(a).

414. Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a qui tam civil action in order to create incentives for private individuals to prosecute violations of the statute.  Subsection 15(a) provides: "An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois.  The action shall be brought in the name of the State."  740 Ill. Comp. Stat. §92/15(a).

415. By virtue of the conduct described in this Complaint, Defendants committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Claims Fraud Prevention Act: knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of

insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat §5/46-1(a).

416. As a result of such conduct, Defendants have received illegal profits to which they were not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

417. The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by Defendants in violate of 740 Ill. Comp. Stat. § 92. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged in this Complaint.

WHEREFORE, Relators, on behalf of themselves, the United States, and the States, pray:

(a)   That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the Federal False Claims Act before November 2, 2015, and $11,000 to $21,563 for each violation after November 2, 2015;

(b)   That the Court enter judgment against Defendants in favor of the States and the Relators in the amount of the damages sustained by the

States, trebled as provided for in the State FCAs, plus civil penalties for each violation of each of the States' FCAs;

(c)     That Relators be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes and proceeds with the action, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(d)     That the Relators be awarded an amount from the proceeds of the action to the States as provided for in the *qui tam* provisions of each of the individual States' false claims acts;

(e)     That the Relators be awarded an amount from the proceeds of the action to the States of California and Illinois as provided for in the qui tam provisions of each individual States' California Insurance Fraud Prevention Act and the Illinois Insurance Claims Fraud Prevention Act;

(f)     That the Court enter judgment against Defendants for damages suffered because of Defendants' retaliation against Relator Jackson;

(g)     That judgment be entered against Defendants jointly and severally, in the amounts to be determined at trial; and

(h)     That Relators be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(i)     That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

RESPECTFULLY SUBMITTED:

This 20th day of December, 2017.

**PAUKERT & TROPPMANN, PLLC**

_____

KATHLEEN H. PAUKERT
WSBA No. 20247
522 W. Riverside Avenue, Ste. 560
Spokane, Washington 99201
Telephone: (509) 232-7760
Facsimile:  (509) 232-7762
Email: kpaukert@pt-law.com

**FINCH MCCRANIE, LLP**

/s/Renée Brooker
_____
Renée Brooker, Esq.
(_Pro Hac Vice Pending_)
DC Bar No. 430159
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
Telephone: (202) 288-1295
Facsimile:  (404) 688-0649
reneebrooker@finchmccranie.com

**FINCH MCCRANIE, LLP**

/s/ Eva Gunasekera
_____
Eva Gunasekera
(_Pro Hac Vice Pending_)
DC Bar No. 502542
225 Peachtree St., NE
1700 South Tower
Atlanta, Georgia 30303
Telephone: (202) 641-3804
Facsimile:  (404) 688-0649
Email: eva@finchmccranie.com

**FROHSIN BARGER & WALTHALL**

/s/ James F. Barger, Jr.
_____
James F. Barger, Jr.
(_Pro Hac Vice Pending_)
AL Bar No. 2336M76B
100 Main St.
Saint Simons Island, Georgia 31522
Telephone: (205)-933-4006 ext. 2
jim@frohsinbarger.com

**FINCH MCCRANIE, LLP**

/s/ Michael A. Sullivan
_____
Michael A. Sullivan, Esq.
(_Pro Hac Vice Pending_)
Georgia Bar No. 691431
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
Telephone: (404) 658-9070
Facsimile:  (404) 688-0649
msullivan@finchmccranie.com

_Counsel for Relators Larry Jackson and Jeff Wilkerson_

[SEALED] _QUI TAM_ COMPLAINT - 106